## WESTERN NATIONAL BANK *v.* ARMSTRONG.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 251. Argued February 2, 1893.—Decided March 12, 1893.

The borrowing of money, by a bank, though not illegal, is so much out of the course of ordinary and legitimate banking business as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow money.

Whether a vice-president of a national bank who had, without authority from the board of directors, paid into the bank a large sum of money and received certificates of paid-up stock for a still larger amount could, on the subsequent insolvency of the bank without ratification of such

increase, recover back his subscription money, or was to be treated as a general creditor, is a question which a court cannot settle in an action to which he is not a party.

IN December, 1888, the Western National Bank of New York, organized under the laws of the United States, and having its place of business in the city of New York, filed a bill of complaint, in the Circuit Court of the United States for the Southern District of Ohio, against David Armstrong, as receiver of the Fidelity National Bank of Cincinnati, Ohio. The bill alleged that the Fidelity National Bank was indebted to the complainant bank in the sum of $207,290, on account of a loan made on May 28, 1887, by the New York bank to the Ohio bank, "at the special instance and request of E. L. Harper, who was then the vice-president and general manager of the said Fidelity National Bank, with full authority to make said loan on its behalf." The bill further alleged that said loan was secured by collateral notes, signed by one A. P. Gahr, and endorsed by said E. L. Harper, and by the endorsement and delivery to the complainant by E. L. Harper of certificates for 1600·shares of the capital stock of the said Fidelity National Bank; that said notes were, when they fell due and still are, entirely worthless by reason of the insolvency of said Gahr and Harper; that said stock certificates did not and do not represent stock of the Fidelity National Bank, but were wholly invalid and void, because they did not constitute a part of the original and authorized stock of said bank, but were a part of a proposed increase of the capital stock of said bank, on account of which E. L. Harper had paid into the bank upwards of $180,000, but which increase had never been voted for by the stockholders of said bank, nor had notice of said intended increase of said capital, with a certificate that the full amount of the same had been fully paid in, ever been sent to the Comptroller of the Currency of the United States, nor had the Comptroller ever assented to such increase of capital, as required by law; but that, nevertheless, said Harper had procured from the president and cashier of said bank the certificates of stock so as aforesaid pledged with the complainant; that when said certificates were so issued to

Harper the stock of the Fidelity National Bank had an established market value of $153 per share, and that the complainant bank relied on said certificates as one of the securities for said loan when it made the same; that said money, so paid in by Harper on account of proposed stock, was held by said Fidelity National Bank on special deposit and in trust for said Harper until such increase of stock should be duly authorized. The relief prayed for was that David Armstrong, receiver of the Fidelity National Bank, which had become insolvent, should allow the claim for said loan, and pay, out of the assets in his hands, dividends, the same as to other creditors of said bank, and that the complainant bank should be subrogated to the rights of Harper on account of the moneys so paid in for stock proposed to be issued, and which the complainant alleged to constitute a preferred claim.

Armstrong, receiver, entered an appearance, and demurred to those portions of the bill in which were alleged the facts respecting the proposed issue of additional stock, and in which the complainant prayed to be subrogated to Harper's supposed rights in respect to the same. The alleged grounds of the demurrer were a want of necessary parties, in that the Fidelity National Bank and E. L. Harper were not made parties to said bill, and for multifariousness.

Subsequently, in November, 1889, the court below sustained the demurrer to so much of said bill as was recited therein — being the said allegations seeking subrogations — and gave leave to answer the remainder of said bill.

An answer was duly filed, denying that the Fidelity company was indebted to the complainant bank; that the complainant had, on May 28, 1887, or at any time, loaned the Fidelity National Bank the sum of two hundred thousand dollars or any other sum, and alleging that the notes mentioned in the bill, made by A. P. Gahr and endorsed by E. L. Harper, were discounted by the complainant bank for said Harper, and that the proceeds of such discount were received by said Harper; that the said notes were at no time the property of the Fidelity National Bank, and that the Fidelity National Bank

never had any interest in said transaction, and was in no way responsible therefor.

The cause was put at issue, evidence taken, and, on April 8, 1890, a final decree was entered dismissing the bill at the cost of the complainant. The case comes to this court on appeal from said decree.

*Mr. Edward Colston,* (with whom were *Mr. Judson Harmon* and *Mr. George Hoadly, Jr.,* on the brief,) for appellant.

*Mr. John W. Herron* for appellee.

MR. JUSTICE SHIRAS delivered the opinion of the court.

Whether the transaction of May, 1887, was a discount by the Western National Bank of New York in favor of E. L. Harper of the four notes made by A. P. Gahr and endorsed by Harper, or was a loan by said bank to the Fidelity National Bank, is the question principally discussed in the briefs and oral arguments of the respective parties.

In disposing of the case we are not assisted by any findings or opinion by the court below, and we are left to conjecture the grounds upon which that court proceeded in dismissing the bill of complaint.

The theory that the case was that of a simple discount by the New York bank of four promissory notes, made by Gahr and endorsed by Harper, and secured by the assignment by Harper of certificates of 1600 shares of the stock of the Fidelity National Bank, comports with the form of the notes themselves. Such a transaction would have been an ordinary one, and in the course of the usual business of such a bank. The letter of May 16, 1887, in which the proposition was made to the New York bank to make the loan, was signed by E. L. Harper in his own name, without any official designation. That the $200,000 were placed on the books of the New York bank to the credit of the Ohio bank was not inconsistent with this version of the case, because it appears that this was done at the request of Harper.

On the other hand, it is claimed that because the letter of May 16, 1887, was written on the letter paper of the Fidelity National Bank, and because the proceeds of the discount were placed to the credit of the Ohio bank, and were drawn out by drafts of that bank, the transaction was thereby shown to have been made on behalf of the Ohio bank.   And C. N. Jordan, vice-president of the New York bank, testified that he understood the proposition to come from the Ohio bank for a loan to it, and that he would not have submitted the matter for approval to the board of the New York bank had he not so understood it.

There are other features of the correspondence that are pointed to by the parties as making for their respective contentions.   It may be conceded that the New York bank acted upon the theory that the loan was to the Ohio bank, and took the notes and certificates of stock as collateral.   But the liability of the Ohio bank is not a necessary consequence of such a concession.   It has further to be shown that the Ohio bank was really a party to the transaction, either by having authorized Harper to effect the loan on its behalf, or by having ratified his action and having accepted and enjoyed the proceeds of the discount.

There is no evidence whatever that the board of directors of the Fidelity National Bank gave any authority to Harper to borrow money on behalf of the bank, much less to borrow so enormous a sum on so long a time.   In this respect the complainant's case stands barely on the assertion in the bill that " Harper was the vice-president and general manager of the Fidelity National Bank, with full authority to make said loan on its behalf."   The only evidence we find in the record tending to support such averment is found in the answer by J. Harvey Waters, the general book-keeper of the Fidelity National Bank, on cross-examination, wherein he stated that E. L. Harper was the vice-president and managing officer, and that by "managing officer" he meant that Harper was " the general manager of the business of the bank."   No such office as that of " general manager" is known or named in the National Bank Acts, nor does any such office exist by

usage. The most that can be claimed in this case is that Harper acted as the principal executive officer of the bank. It cannot be pretended that, as such, he had power, without authority from the board, to bind the bank by borrowing $200,000 at four months' time.

It might even be questioned whether such a transaction would be within the power of the board of directors. The powers expressly granted are stated in the eighth section of the National Bank Act (Rev. Stat. § 5136, par. 7): A national bank can "exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes."

The power to borrow money or to give notes is not expressly given by the act. The business of the bank is to lend, not to borrow, money; to discount the notes of others, not to get its own notes discounted. Still, as was said by this court, in the case of *First Nat. Bank* v. *Nat. Exchange Bank,* 92 U. S. 122, 127, " authority is thus given in the act to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others."

Nor do we doubt that a bank, in certain circumstances, may become a temporary borrower of money. Yet such transactions would be so much out of the course of ordinary and legitimate banking as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow money.

Even, therefore, if it be conceded that it was within the

power of the board of directors of the Fidelity National Bank to borrow $200,000 on time, it is yet obvious that the vice-president, however general his powers, could not exercise such a power unless specially authorized so to do, and it is equally obvious that persons dealing with the bank are presumed to know the extent of the general powers of the officers.

Without pursuing this part of the subject further, we think it evident that Harper had no authority to borrow this money, and that the bank cannot be held for his engagements, even if made in behalf of the bank, unless ratification on the part of the bank be shown. It is scarcely necessary to say that a ratification, to be efficacious, must be made by a party who had power to do the act in the first place; that is, in the present case, the board of directors; and that it must be made with knowledge of the material facts. There is not the slightest evidence shown in this record that the board of the Fidelity National Bank, by any act, formal or informal, undertook to ratify Harper's action in the premises, or that they ever had any knowledge of the transaction.

It is true that a corporation may become liable upon contracts assumed to have been made in its behalf by an unauthorized agent by appropriating and retaining, with knowledge of the facts, the benefits of the contracts so made on its behalf. But there is no room for such a contention in the present case. The money advanced by the New York bank was, indeed, at Harper's request, placed to the credit of the Ohio bank, but it was shown that it was withdrawn partly by Hopkins, the assistant cashier, and partly by Harper himself, by drafts in the name of the bank, but that the moneys thus drawn never came into the actual possession or use of the bank. The moneys were appropriated by Harper to his own use, or, at all events, it does not appear that the bank ever got a penny of the borrowed money or any benefit or advantage whatever by reason of the transaction. The mere placing of the money in the name of the Ohio bank involved no ratification by the bank unless it was so placed with their knowledge and assent, nor did the withdrawal of the money

by drafts drawn by Harper or by his direction in the name of the bank constitute a receipt by the bank of such money, unless it was, in point of fact, received and used by the bank or for its benefit. Not this, but the contrary was shown.

So far, then, as the case of the plaintiff in error depends on the alleged loan of money to the Fidelity National Bank, we find no error in the decree of the court below in dismissing the bill.

. This brings us to the consideration of the other phase of the case, namely, that which arose on the claim of the New York bank as the holder of 1600 shares of the stock of the Fidelity National Bank, transferred to it as security by Harper, to be subrogated to the supposed right of Harper to be repaid the moneys paid in by him on account of his subscription for an increase of stock, not voted for by the stockholders, and not approved by the Comptroller of the Currency.

The court below sustained the demurrer to this portion of the bill. Two grounds were asserted in the demurrer — one, the insufficiency of parties, in that neither the Fidelity National Bank nor Harper were made parties; the other, that of multifariousness. It is now contended before us that Harper was not a necessary party because, as is averred in the bill and admitted by the demurrer, he had pledged and assigned this stock to the complainant bank, and it is argued that the bank thereby became vested with whatever rights Harper had to have his money returned to him as a special deposit. It is also contended that asserting such a right of subrogation is so far within the equities of the bill, and so necessary an incident of the transaction, as to relieve the bill of the charge of being multifarious.

It is not easy to see why, if the complainant were really entitled to be subrogated to the rights of Harper in respect to the hypothecated stock, such a claim might not be set up in the same bill in which it seeks to be allowed, as a lender of money to the Fidelity National Bank, to participate in the payments made by the receiver.

But, however that may be, it seems to us that Harper, having procured an issue to himself of certificates of paid-up stock,

was in no position, when the bank became insolvent, before the necessary steps to legitimate the increase of stock had been taken, to demand back his money, as if it were trust money, or constituted a preferred claim against the assets of the bank in the hands of the receiver. The utmost that he could claim would be to be treated as a general creditor, and entitled as such to participate in the payments made by the receiver.

In the case of *Winters* v. *Armstrong, Armstrong* v. *Stanage*, 37 Fed. Rep. 508, which was the case of a suit by the receiver of the Fidelity National Bank to recover, from a subscriber to the preferred increase of stock of that bank, the amount of a promissory note given in payment of such subscription, it was held by Mr. Justice Jackson, then Circuit Judge, that, as the necessary steps had not been taken to legitimate such increase of stock before the bank became insolvent, there was a failure of consideration, and the receiver could not enforce payment of the note. We, however, agree with the court below in thinking that such a question could not be raised in the present case, to which Harper was not a party. Harper had paid in the full amount of his subscription, and had procured the issue to himself of certificates for his stock, and had parted with the legal title to the stock by transferring the certificates to the New York bank. In such circumstances it might be claimed, with some appearance of justice, that Harper and his transferee were precluded from opening up the transaction and procuring a rescission of the subscription. If that were so, the holder of such stock, whether Harper or the New York bank, might have been compelled to contribute to the payment of the indebtedness of the insolvent bank. *National Bank* v. *Case*, 99 U. S. 628.

So, too, even if it were held that Harper was not precluded from surrendering his stock and recovering back the money paid on account of it, it might yet be made to appear that Harper, if he were answerable for the mismanagement which resulted in the bank's insolvency, could not, in a court of equity, and as against the creditors of the bank, recover back his subscription money. But it is plain that such questions as

these could not be adjudicated in the absence of Harper as a party, and we therefore think the court below did not err in sustaining the demurrer for that reason.

Upon the whole, we are of opinion that the decree of the court below, in sustaining the demurrer, and in dismissing the bill, should be

*Affirmed.*