MERCHANTS' NAT. BANK v. ARMSTRONG.

(Circuit Court, S. D. Ohio, W. D.    January 28, 1895.)

No. 4,427.

1. NATIONAL BANKS — LIABILITY FOR FALSE REPRESENTATIONS BY OFFICERS — DECEIT.

The directors of the F. National Bank made four reports to the comptroller of the currency, under the provisions of the national banking law,

all of which were false. The officers and directors published and distributed to the stockholders of the bank a statement representing that the bank was in a very flourishing condition, whereas in fact it was insolvent, and was known to the officers and directors to be so. The M. Bank, believing these representations to be true, discounted a note for one J., solely upon the security of certain shares of the stock of the F. Bank, which ultimately turned out to be worthless. There was no connection or communication between the F. Bank and the M. Bank or J. *Held,* that the F. Bank could not be held liable to the M. Bank for deceit, since there was no privity between them, and it was not in the power of the officers to bind the bank by representations to a mere stranger to induce him to enter into a transaction in which the bank was not at all interested.

**2.** DECEIT—TO WHOM REPRESENTATIONS MADE.
In order that a party may be made liable for deceit, the representations claimed to be false must be made directly to the person injured.

This was an action by the Merchants' National Bank of Hillsboro, Ohio, against David Armstrong, receiver of the Fidelity National Bank of Cincinnati, to recover damages for false representations and deceit. Defendant demurs to the complaint.

Follett & Kelley, C. H. Collins, and Robert M. Dittey, for plaintiff.
John W. Herron, for defendant.

SAGE, District Judge. From the allegations of the petition it appears that the plaintiff loaned $10,000 on the 23d of December, 1886, to J. H. Matthews, and took as security therefor certain shares of the capital stock of the Fidelity National Bank. The directors of the bank, in accordance with the provisions of section 5211, Rev. St. U. S., made four reports exhibiting its financial condition. These reports were issued October, 1886, January, 1887, March, 1887, and May, 1887, and were all false. On the 13th of January, 1887, the bank caused to be issued and published a certain statement in writing, or circular, and mailed it to the plaintiff, among others. In that statement it was represented that the bank was doing a larger business than ever, and that the deposits had reached on that day the highest point in its history; that it had the largest capital, surplus, and deposit account of any national bank in Ohio. This statement was signed by the president, vice president, cashier, and assistant cashier of the bank.

It further appears from the petition that the bank was in fact insolvent at the date of each one of said reports, in which it was represented to be solvent and in a highly prosperous condition; that said reports were made with the knowledge and assent of the officers and directors of the bank; and that said officers had actual knowledge of the falsity thereof, and were grossly negligent of their duties in the management of the affairs of the bank.

It is further averred that the bank was wholly insolvent when the circular aforesaid was issued; that the same was issued and published with the knowledge and assent of said officers and directors; and that they had actual knowledge of the falsity of its statements.

It further appears that the several reports of the condition of the bank were published in the daily newspapers of the city of Cincinnati. The petition also sets forth the particulars in which the statements and circulars aforesaid were false, and states that, relying

upon the false statement of October, 1886, published on the 11th day of that month, and believing it to be true, plaintiff accepted 100 shares of the capital stock of the bank as security for its loan to J. H. Matthews, and that said loan was made upon the credit of said stock, and upon its value as appeared from said reports, and upon no other credit or security; that said loan would not have been made, or said security accepted, if said report had contained a true statement of the condition of said bank. The note was payable on demand.

It is further averred that believing and relying upon the statements of the subsequent reports, and of the circular of January 13, 1887, the plaintiff made no demand upon said Matthews for the payment of said note until the 17th of June, 1887, nor did it attempt to convert said stock held as collateral into money, as it might have done; that on said date, by reason of the mismanagement of the affairs of the said corporation by its said directors, the misappropriation of its means, and the unlawful loaning of its moneys by its vice president, as set forth in the petition, and the misconduct of its officers and board of directors, the bank had become wholly insolvent, and said stock entirely worthless.

Finally, it is alleged that the plaintiff has suffered loss and damage by reason of the premises in the sum of $10,000, and has presented its account therefor to the defendant as a valid claim against the bank, and made demand for the allowance of the same, which he has refused. The prayer is for judgment for $10,000, with interest from April 5, 1887.

The defendant demurs for insufficiency, stating two general objections to the plaintiff's recovery. The first objection is that it is not in the power of the directors and officers of a national bank to bind the bank for deceit by representations made to a mere stranger, which had the effect to induce him to loan another stranger money upon the security of shares of the capital stock of the bank, the bank not being in the least interested in the transaction. The defendant does not deny the liability of a national bank for deceit or tort committed by its officers when the representations complained of are made by them in the regular course of their duties prescribed by law. The contention is that the plaintiff had no business with the bank which authorized the officers of the bank to make representations which would bind the bank, so far as the plaintiff is concerned. It is urged that the business of the bank was banking, and that the authority of its officers was limited thereto.

In Tyler v. Savage, 143 U. S. 79, 12 Sup. Ct. 340, cited for the plaintiff, the bill was taken as confessed against the corporation, and no question as to its liability was considered by the court below, nor in the supreme court. The misrepresentations were made by the defendant, Tyler, who was president of the company, and the appeal was taken on his behalf. The court dealt only with the question of his personal liability.

In Bank v. Graham, 100 U. S. 699, it was held that corporations are liable for every wrong they commit; that in such cases the doctrine of ultra vires has no application, and that they are liable

for the acts of their servants, while such servants are engaged in the business of their principal, in the same manner and to the same extent as individuals under like circumstances. As to the case with which the court was dealing, the opinion was expressed that if a bank be accustomed to take special deposits with the knowledge and acquiescence of the directors, and a deposit was lost by the gross carelessness of the bailee, a liability ensued just as if the deposit had been authorized by the terms of the charter. The court also found that under section 46 of the banking act of 1864, re-enacted in section 5228 of the Revised Statutes, it was clearly to be implied that a national bank, as a part of its legitimate business, might receive such deposits. Here the question is whether the officers of the bank had any authority to bind the bank by representations made to a mere stranger, who was not entering upon any transaction with the defendant, but was proposing to loan money to a private individual, and take the stock of the bank as security. At page 198 of his work on Torts, Judge Cooley, by way of illustration of the general proposition that the agents and officers of a corporation cannot impose liability on the corporation by undertaking to do what the corporation is not empowered to do, puts the case of fraudulent representations made by an officer of a national bank in the selling of railroad bonds on commission, and says that, as the bank has no power to make such sales, the fraud is the individual wrong of the officer. To the same effect see Weckler v. Bank, 42 Md. 581. In that case the bank was engaged in selling bonds of the Northern Pacific Railroad Company on commission, and its teller in selling same to the plaintiff made certain misrepresentations. An action for deceit was brought against the bank. The court held that the bank was not liable, inasmuch as it had no authority to sell bonds, and no authority to make representations as to them, and hence the teller who made the misrepresentations had no such authority.

The supreme court in Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572, held that the vice president and general manager of a bank, without special authority from the directors for the purpose, had no power to bind the bank by borrowing money in its name. The court said that such transactions would be so much out of the course of ordinary and legitimate banking as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow the money. Applying that case to this, here was a transaction which was not within the scope of the business of the bank; had nothing to do with its transactions; was altogether res inter alios acta. It is claimed to hold the bank because of certain alleged representations made concerning the collaterals securing the loan. In the leading case of Pasley v. Freeman, 3 Term R. 51, Grose, J., said that he had not met with any case of an action upon a false affirmation, except against a party to a contract, where there was a promise, either expressed or implied, that the fact misrepresented was true. There is a case (Levy v. Langridge, 4 Mees. & W. 336) in which, as appears from the report of the case in the court below (2 Mees. & W. 519), the defendant had sold a gun to the father

of the plaintiff for the purpose of being used by the plaintiff, and knowingly made a false warranty that it might be safely used. Lord Denman said that the court agreed with the court of exchequer below, and affirmed the judgment on the ground, stated by Parke, B., "that as there is fraud, and damage, the result of that fraud, not from an act remote and consequential, but one contemplated by the defendant at the time as one of its results, the party guilty of the fraud is responsible to the party injured."

Suppose the plaintiff, when it was solicited to make the loan set forth in the petition, had by letter, or by its officers personally, consulted the officers of the bank as to the condition of the bank, and the value of stock offered as collateral security, and received in answer assurances, which those officers knew to be false, that the bank was solvent and the stock of full par value; certainly it could not be held that the bank itself was liable for those misrepresentations, so entirely without the scope of the authority of those officers, whatever might be said as to their personal liability. It is not easy to see any distinction in principle between such a case and the case stated in the petition. But it is urged that the reports to the comptroller were not for stockholders alone, but also for all parties who might have occasion to deal with the bank, or in the stocks of the bank, or to take them as collateral security. The argument is that, if the purpose of making the reports were only to inform the comptroller of the currency of the condition of the bank, the requirement that the reports be published in the newspaper would be entirely unnecessary.

It is further urged that the publication is not intended alone for those who are stockholders and depositors at the date of the report, because notice of its contents could be brought home to them in a less public manner, and that the making and publishing of the reports must be for the further purpose of informing those who may contemplate dealings with the bank, or may be brought into connection with it, in any way in which the financial condition of the bank would be a consideration of moment. For illustrations, owners of shares of stock, those about to purchase such shares, and third parties having dealings in the stock, entirely independent of and apart from the bank, are referred to. In short, the claim is that the reports were addressed to the general public, and the plaintiff, having acted upon them, was misled to its damage, and entitled to recover. The reports were not made voluntarily, but in compliance with the requirement of the statute. They must be taken to be made only to those within the contemplation and protection of the statute. Experience teaches that the danger of banks, as distinguished from other corporations or agencies for the transaction of business, is not in the fact that their stock may be issued and bought and sold on the market, but in their power to issue notes, receive deposits, and make discounts. The government has always shown a disposition to regulate banks in order to secure the public against the misuse of these functions. The act is entitled "An act to provide a national currency." It is entirely directed to providing for the safety of the note issue and the security of the discounts

and deposits.     All its collateral provisions, of which there are a number, including the one under discussion, are directed to that end.     The conclusion is irresistible that the statute, in requiring reports such as those in question, contemplates merely the persons who deal directly with the bank as a financial institution; that the report, therefore, is directed to them, and they only can recover. Dealers in the stock of the bank, and holders of it as collateral, are not, under the statute, privy to the reports, and, if deceived or misled by them, they cannot recover against the bank.     Counsel cite from Cooley, Torts, p. 493, where it is said that "some representations are made for the express purpose of inducing individuals or the public to act upon them, and whoever in fact does receive, rely, and act upon these, in the manner intended, has a right to regard them as made to him, and treat them as frauds upon him, if in fact he was deceived to his damage."     But, in the view just taken, the bank cannot be held to have issued the reports for the purpose of inducing transactions such as that set forth in the petition, and the citation, therefore, does not apply.

The case of Graves v. Bank, 10 Bush, 34, is cited.     There the action was by the bank against sureties on the bond of its cashier for acts of embezzlement occurring subsequent to the execution of the bond.     It appears, however, that before the bond was executed there had been a false statement published by the bank, showing that the bank was prudently managed; the fact being that the cashier had been guilty of repeated frauds and embezzlements. The court released the sureties upon the ground that the fraudulent statement was addressed "to the public," and that those about to go upon the bond of the cashier had a right to rely upon it.     This case was expressly put upon the ground that the bank owed the sureties a special duty of entire frankness as to its condition, and its relation to its cashier, and therefore the sureties had a right to rely upon the published staement.     If it could be shown that there is any such privity between the bank and third persons dealing among themselves in its stock, or that the bank owed them any such duty, this case might apply; but no such claim can be maintained.     Reliance, also, is placed upon the opinion of the court in Bank v. Thoms (Super. Ct. Cincinnati; June, 1892) Wkly. Cin. Law Bull. 164.     The facts in that case and this are essentially the same, but the action was against the directors and officers involved, and not against the bank. It was held that the plaintiff was entitled to recover, in an action for deceit, the amount of his damage from the officers fraudulently signing said reports.     Whether the directors who made the false reports in this case are liable, is not a question before the court. If we recognize that the reports provided for in section 5211 are made to the public as well as to the comptroller of the currency, it does not follow that either the directors, other than those who with guilty knowledge attest a false report, or that the bank itself, is liable.     Upon the trial of the directors of the City of Glasgow Bank before the high court of justiciary, for fabricating and falsifying the balance sheets of the bank, and embezzling and theft, Lord Moncrieff in his charge to the jury said:

"A director is generally a man who has other avocations to attend to. He is not a professional banker. He is not expected to do the duty of a professional banker, as we all know. He is a man selected from his position, from his character, from the influence he may bring to bear upon the welfare of the bank, and from the trust and confidence which are reposed in his integrity and in his general ability. But I need not say that it is no part of his duty to take charge of the accounts of the bank. He is entitled to trust the officials of the bank who are there for that purpose, and, as long as he has no reason to suspect the integrity of the officials, it can be no matter of imputation to him that he trusts to the statements of the officials of the bank, acting within the proper duties of the department which has been intrusted to them."

This is a correct statement of the duty of the directors, and their liability is to be measured accordingly. It would seem to follow that the directors who took no part in the preparation of the fraudulent statement, and had no knowledge of, or reason to suspect, its falsity, would not be liable. By parity of reasoning, neither the bank itself, nor its stockholders, would be liable; for the liability of the stockholders is involved in the liability of the bank.

Another ground upon which this demurrer is placed is that:

"It is not enough to make a cause of action that a statement is made in such manner as that the plaintiff is likely to rely upon it, or that it is on a subject which interests or affects the plaintiff. It must be made to the plaintiff. There must be some privity between the plaintiff and the defendant. Many statements are of such a nature that investors and traders use them as data in business, and rely upon them, but they do so at their own risk, if the statement was not made to them for the purpose of inducing the kind of action they took. If the statement is made to a class, the plaintiff must be one of that class. It is not enough that, though not one of the class, he is interested in the statement, and chooses to use it as a basis of action."

This proposition has been already in part considered. In support of it, the case of Wells v. Cook, 16 Ohio St. 67, is cited. In that case the owner of sheep apparently sound and healthy, but known by him to be affected by contagious disease, falsely and fraudulently represented them as sound and healthy to Orlando Wells, the plaintiff, as the agent of his brother, Osmond Wells; and Orlando, confiding in such representations, bought them for Osmond, with the avowed purpose of mingling them with a large flock then belonging to Osmond. In consequence the united flock was infected, and, the plaintiff and Osmond Wells being still unaware of the existence of the disease, the plaintiff bought the united flock from Osmond, and suffered damage from the continued spread of the disease. Held that, the representations not having been made to the plaintiff to induce him to act upon them in any matter affecting his own interests, he could not maintain an action against the defendant for the deceit. The court said that there must be fixed a limit between the near and remote and the direct and indirect consequences of false and fraudulent representations, beyond which the law will not take cognizance of them; and that one of the limits is that the false and fraudulent representations must have been intended to be acted on, in a matter affecting himself, by the party who seeks redress for consequential injuries.

In Peek v. Gurney, L. R. 13 Eq. 79, and L. R. 6 H. L. 377, the firm of Overend, Guerney & Co. being insolvent, the parties resolved to

sell the concern to a stock company, to be organized for the purchase. To induce the public to subscribe for shares, they issued a prospectus in which the fact of insolvency was withheld. If it had been disclosed, the company would not have been formed. The directors withheld the fact, honestly believing that the speculation on which they were about to embark would be successful. In October and December, 1865, the plaintiff, on the faith of the prospectus, bought in the market shares which had been originally allotted to a partner in the insolvent firm. In May, 1866, the company stopped payment, and was afterwards wound up. The plaintiff was compelled to pay large sums by reason of his liability as a stockholder. In March, 1868, he filed a bill seeking to be indemnified in respect of his loss by the surviving directors and the estate of a deceased director. It was held that if he had been an original stockholder, and had made his claim in due time, he would have been entitled to such indemnity, but that he was debarred of his remedy on the ground that he was in no better position than the original stockholder from whom he bought; and, secondly, that he had come too late for relief. The original stockholder was not deceived as to the condition of the affairs. The court held that the directors were relieved from any liability in a criminal court by reason of their belief in the probable success of the company, but that that belief could not exonerate them from liability in a court of equity, because the absence of guilty intent, while it would divest the criminal jurisdiction, would not take away the equitable jurisdiction upon the ground of fraud. The court then came to the question whether the case of deception applied to the case of a transferee of the stock as well as to the case of an original subscriber who was deceived, assuming that, if the matter had been brought immediately to the cognizance of the court, the original subscribers could have renounced their shares, and required repayment of their advances. Lord Romilly said that "a question of considerable importance and of a distinct character arises, as regards the transferee of a share, namely, whether the misconduct of the directors is a vice that taints the share itself, into whosesoever hands it passes, or whether the share itself is purified by the conduct of the allottee or any subsequent holder of the share." He was of opinion that the plaintiff could do no more than the original allottee could have done, and he thought the original allottee was cognizant of the whole matter. In other words, the prospectus was not recognized as a document on which the plaintiff could, on his own behalf, rely; for its operation was limited to those who subscribed to the stock on the faith of its representations, and the plaintiff, as transferee of shares, acquired by his purchase nothing more than the equity of the original holder. The house of lords in the same case (L. R. 6 H. L. 377) held that the plaintiff could not recover, as the prospectus was not addressed to him, nor intended to induce such action as he took, although it had been published broadcast, and the plaintiff naturally relied upon it. That case cannot be distinguished, in principle, from this. The most that can be claimed as to the false circulars is that they were intended to invite business

to the bank. See, also, Swift v. Winterbotham, L. R. 8 Q. B. 244, and Richardson v. Silvester, L. R. 9 Q. B. 34.

In Hunnewell v. Duxbury, 154 Mass. 286, 28 N. E. 267, action was brought by one who had taken the note of the company of which the defendants were directors on faith of the certificate required by law to be filed with the secretary of state by a foreign corporation doing business in the state. The law required that the certificate should state the amount of capital subscribed for and the amount paid in. It was held that the object of the certificate was not to procure credit among merchants, but to give permission to do business in the state, and not being made to the plaintiff, though the plaintiff might naturally rely upon it, he could not maintain an action for deceit against the directors.

In Bank v. Sowles, 46 Fed. 731, the directors, during a run upon the bank, signed and placed conspicuously in the public banking room a statement that the bank was sound, and would pay all its liabilities. The president of the plaintiff bank loaned money to the defendants on the strength of this notice and of certain oral representations made by the defendants. The oral representations were excluded, on the ground that the statute of Vermont, in which state the case arose, required such representations to be made in writing. The court held that the defendants were not liable upon the written statements. It said:

"That such a representation was so made somewhere, at some time, to some person, by the persons sought to be charged, is not sufficient; it must be made to the person seeking to charge them."

The court cited Grant v. Naylor, 4 Cranch, 224; Russell v. Clark, 7 Cranch, 69. The court further said:

"This writing was not delivered to, nor to any one for, the plaintiff, and the plaintiff was not one of those for whom it was obviously intended. If it had been signed by the defendants as individuals, instead of as directors, it would not appear to have been a representation to the plaintiff on which they could be charged, within the meaning of this statute. But, further, this notice was an official statement of the defendants as directors, on its face, made to the then creditors to inspire confidence, rather than as individuals to procure loans."

This case did not depend upon the local statute. The only effect of that statute was to shut out the oral representations, and confine the plaintiff to the written statements. These cases are in accord with the general principles of law applicable to this case. Upon the doctrine in them stated, and upon the general principles therein stated, as well as upon the considerations heretofore set forth, the demurrer must be sustained, and the petition dismissed.